**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MICHAEL FOLGER, | : | CIVIL ACTION NO. 16-1487 (JLL) |
| Plaintiff, | : | **O P I N I O N** |
| v. | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

**LINARES, District Judge**

Michael Folger has filed an appeal in order to seek judicial review of a final decision (hereinafter, "Decision") of an administrative law judge (hereinafter, "the ALJ") issued on behalf of the Commissioner of the Social Security Administration ("Commissioner"), dated October 24, 2014, which granted in part and denied in part the portion of his claim for disability insurance benefits and for supplemental security income premised upon an alleged mental disability. (See dkt. 1; dkt. 5-2 at 22–43.) See also 42 U.S.C. § 405(g); L.Civ.R. 9.1.

The Court has carefully considered the administrative record, as well as the submissions made in support of and in opposition to the instant appeal, and decides this matter on the briefs of the parties and without conducting oral argument. (See dkt. 5 (administrative record); dkt. 9 (Folger's brief); dkt. 14 (Commissioner's brief).) See L.Civ.R. 78.1(b); L.Civ.R. 9.1. For the reasons set forth below, the Court affirms the Decision.

## THE DECISION OF THE ALJ

Folger applied for benefits in 2007 and in 2011, and alleges an onset of disability date of March 20, 2005. The ALJ conducted a hearing on April 15, 2014. (R. at 105–185.) The Decision, wherein the ALJ provides a comprehensive factual history and an accurate summary of the required

five-step process to determine whether a claimant is disabled, states in relevant part:

> [The] application was denied through the hearing level by Administrative Law Judge ("ALJ") Decision dated January 7, 2010. The claimant appealed, and the Appeals Council remanded the matter by Order dated June 24, 2011. A second hearing was held and by Decision dated December 29, 2011, the claimant's application was again denied, he appealed, and on September 27, 2013, the Appeals Council again vacated the ALJ Decision and remanded the matter for further proceedings.

> In its remand order, the Appeals Council directed the presiding ALJ to: evaluate the claimant's mental impairments; consider the claimant's maximum residual functional capacity; and if warranted, obtain evidence from medical and vocational experts.

> . . . . The claimant appeared and testified at a hearing held on April 15, 2014 . . . . Esperanza Distefano, an impartial vocational expert, also appeared and testified at the hearing. The claimant is represented by . . . an attorney . . . .

> . . . .

## DETERMINATION

After careful consideration of all the evidence, I conclude the claimant has been under a disability within the meaning of the Social Security Act as of January 23, 2012 through the date of this Decision, but not prior thereto.

## APPLICABLE LAW

[There is] a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a) and 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, I must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b) and 416.920(b)). Substantial gainful activity ("SGA") is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a) and 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b) and 416.972(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 404.1574, 404.1575, 416.974, and 416.975). If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, I must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR

404.1520(c) and 416.920(c)).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1521 and 416.921; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p).  If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled.  If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, I must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and 416.909), the claimant is disabled.  If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, I must first determine the claimant's residual functional capacity (20 CFR 404.1520(e) and 416.920(e)).  An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.  In making this finding, I must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p).

Next, I must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 404.1520(f) and 416.920(f)).  The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b), and 416.965).  If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g) and 416.920(g)), I must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, he is not disabled.  If the claimant is not able to do other work and meets the duration requirement, he is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order

to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512(g), 404.1560(c), 416.912(g) and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, I make the following findings:

. . . . The claimant has had the following severe impairments: . . . major depression, post traumatic stress disorder ("PTSD") and a history of substance abuse (20 CFR 404.1520(c) and 416.920(c)).

The above impairments are severe because they have resulted in the limitations described . . . below.

At no time since his alleged onset date have any of the claimant's impairments met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . . . The severity of the claimant's mental impairment does not meet or medically equal the criteria of listing 12.04 or 12.06. In making this finding, I have considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

For reasons discussed in depth [herein], I have not accorded significant weight to the opinions of the claimant's treating sources, all of whom reported GAF ratings in the moderate range. That said, I make the following findings with respect to the four areas of functioning prior to the established onset date of January 23, 2012:

In activities of daily living, the claimant has had mild restriction. In August 2006, for example, the claimant was reportedly doing well, had finished school and was looking for a job and he stated that he was keeping busy and generally doing well. Moreover, in December 2007, Dr. Arrington, the consultative psychiatric examiner, stated that the claimant took care of his personal needs, cooked, prepared meals, cleaned, did laundry, shopped and used public transportation. The claimant also reported normal activities of daily living. According to an April 2011 report, the claimant was independent in his grooming, household chores and ability to use transportation. Accordingly, a finding of

mild restriction in this domain is supported.

In social functioning, the claimant had moderate difficulties. The treatment notes indicated that while the claimant was having relationship issues, in 2008 and 2009, he was nevertheless active, feeling okay, socializing and meeting new people and making attempts to extend his social network. Further, by the end of 2010, the claimant's mood was euthymic and he was noted to have made significant progress over the course of his PTSD study. Additionally, Dr. Arrington, a consultative psychiatric examiner, described the claimant as cooperative and stated that his manner of relating, social skills and overall presentation were adequate and that his language skills were adequate; but opined that the claimant needed support to relate adequately with others while the state's assessments reported moderate limitations in this area. As such, a finding of moderate limitations in this area is supported by the evidence.

With regard to concentration, persistence or pace, the claimant had moderate difficulties. There is little indication in this record that the claimant has any cognitive limitations despite the opinion of the one time examiner Dr. Abrams. In April 2011, for example, the claimant's cognitive functioning was normal and his concentration, attention and memory were intact and his intelligence was average and even his insight and judgment were good. Dr. Arrington also stated that the claimant's attention and concentration were intact and that his memory skills were only mildly impaired and opined that he could do simple work while the state's assessments reported no more than moderate limitation in this domain. Further, the contemporaneous treatment records from UBH stated that the claimant's concentration, attention and memory were good. In light of the state's assessment, coupled with the claimant's GAF ratings of 59, a finding of moderate limitations in this area is supported by the evidence.

As for episodes of decompensation, the claimant had an episode of decompensation, which required rehabilitation treatment.

Because the claimant's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

I have also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental

function analysis.

As of January 23, 2012, however, I find that the claimant has had marked limitations in his social functioning and moderate restrictions in his ability to carry out his activities of daily living and concentrate, persist and pace himself. The claimant has had no episodes of decompensation that required hospitalization. As of January 23, 2012, however, the claimant's mental status deteriorated. This is discussed in detail . . . below.

. . . . As to the claimant's mental limitations, I find that prior to January 23, 2012, the claimant was limited to performing simple, routine and repetitive tasks in a non-assembly line job that was low stress in nature and which required no more than the occasional contact with co-workers, supervisors and the general public and which would have allowed for five minute breaks hourly, to be off task for ten percent of the time and to be absent from his job two days monthly.

As of January 23, 2012, however, the claimant has been unable to manage even a low level of stress, maintain a regular schedule and travel using public transportation on a daily basis or interact appropriately with others in the work place and he has since that time been unable to sustain his concentration for extended periods of time of more than [an] hour.

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this Decision.

I will first address the claimant's mental limitations, namely, depression, PTSD and a history of substance abuse, the latter of which has been in remission since 2005.

I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p.

Specifically, the claimant stated, in relevant part, that his ability to work was limited due to PTSD, depression and anxiety and that he could not sleep well or concentrate and that his depression was all consuming (Exhibit 2E).

In September 2007, the claimant stated that he had difficulty concentrating, sleeping through the night, exercising and had anhedonia but that he did do light cleaning, laundry and ironing and could use public transportation by himself and shopped two to three times weekly and spent his time attending support groups and watching television. The claimant stated that he was alienated from his family, kept to himself and did not make friends easily.

In September 2007, a Third Party Report completed by a friend also indicated that the claimant did laundry and cleaned the apartment but that he had difficulty concentrating.

In April 2011, the Disability Interviewer observed that the claimant had difficulty concentrating.

In June 2011, the claimant also stated that he had difficulty getting along with others and did not socialize and that he stayed at home due to anxiety and no longer enjoyed music or physical activity and did not follow instructions well.

In his 2011 application, the claimant stated that he was disabled due to depression, anxiety, PTSD as a result of being in the WTC on September 11th and the deaths of his mother and aunt, who were on Flight 93 that day. The claimant stated that he had recurring flashbacks and nightmares from the event and that he felt anxious, jumpy, and anti-social and had difficulty leaving his apartment and interacting with others and feared for his safety. The claimant also stated that he had anxiety attacks and chest pain and had difficulty focusing and concentrating for any period of time and felt sad and had crying spells. The claimant stated that he did not enjoy the things he used to do and had difficulty sleeping at night.

In his Activities of Daily Living report completed on April 14, 2011, the claimant stated that while physically able, he was not motivated to do his chores and that a friend helped him with laundry and cleaning and that his hobby was essentially watching television most of the day; he was uninterested in most things due to depression and anxiety, but did attend 12 step groups. The claimant stated that he was still sad, had crying spells and panic attacks and had little social life or activities and had difficulty with memory, completing tasks, concentrating, following instructions and getting along with others and had difficulty sleeping at night and did not handle stress well.

According to a medications lists, the claimant had taken Cymbalta, Trazodone, Kaletra, Epzicom, Ativan, Albuterol and Tricor; and Cymbalta and in 2013 he was taking Effexor, Clonidine and Abilify.

At the outset, I note that the claimant stated that his PTSD symptoms began after his mother and aunt perished in the September 11th attacks in addition to which, the claimant's partner had in 2000 died of AIDS. According to this record, the claimant resumed working after a six month hiatus after the September 11th attacks; however, his drug abuse escalated, he eventually stopped working, became homeless and entered a drug treatment program at Integrity House, obtained subsidized housing and began outpatient treatment in March 2005 at the Impact Program, University Behavioral Healthcare ("UBH"), through the University of Medicine and Dentistry of New Jersey ("UMDNJ").

By and large, the treatment records demonstrated that once the claimant stopped using drugs and once treatment was underway, his mental status improved until January 2012. This is apparent by the contemporaneous treatment records, which for the most part document near normal mental status examinations prior to March 2012 and GAF ratings that reflected no more than moderate symptoms that would affect his functioning. While

the evidence most certainly indicates that the claimant had mental limitations prior to January 2012, it also indicated that he retained the residual ability to do unskilled work in a job that involved no more than a low level of stress. This is discussed in detail below.

Specifically, the claimant began treatment at UBH, a clinic at UMDNJ, with Ms. Cunha Attrino, a social worker, and Dr. Lim, a psychiatrist, on March 21, 2005, where he was admitted to the "Impact Program" and underwent grief counseling. The claimant saw Ms Attrino weekly and Dr. Lim monthly.

On admission to Impact House in March 2005, the claimant stated that he was not taking medications for HIV, his mood was stable mood, his CD4 cell count was 690, and he had an adequate appetite and sleep and was not majorly depressed and was able to cope. Further, the claimant denied suicidal ideation and had been abstinent from drugs and alcohol for two months. Notably, the claimant had stopped taking Zoloft, because, he stated, he did not need it. On examination, even the claimant's affect was full range, his thought content was unremarkable, his attention, concentration and memory were intact, and he had good insight and judgment. The claimant was diagnosed with bereavement and asymptomatic HIV infection and he was accorded a GAF of 65, reflecting only mild symptoms or some difficulty in functioning.

Notably, by March 2007, the claimant was much improved and in May 2007, the claimant was doing fairly well and again was reported to be much improved. Further, in July 2007, the claimant was again reportedly "very much improved" and his mental status examination was normal. By November 2007, the claimant stated that he was doing well and feeling better with Cymbalta and had no side effects from medications. In fact, his mental status was normal, his concentration was good, his mood and affect were euthymic, and he was psychiatrically stable.

Additional records from UBH indicated that in March 2009, the claimant was having relationship issues, but his mood was nevertheless stable and his affect was appropriate. Further, in March 2009, the claimant reported that he was doing well and had no side effects from medications, his mental status examination was normal and his condition was "very much improved".

In late 2009, the claimant began cognitive behavioral therapy for a PTSD study. Those records stated that the claimant wanted to return to work. Moreover, the UBH treatment records from the Impact Program that were signed by Ms. Cunha indicated that even when feeling at his worst, the claimant's mental status examinations were normal; he was not suicidal, his insight and judgment were good, his memory was intact and his attention span and concentration were also good although his mood and affect were anxious and dysthymic, respectively. In fact, in June 2009, the claimant stated that he was feeling better, calmer and less anxious overall. The claimant stated that he would find a job if his SSD was denied and by August 2009, the claimant was extending his social network and meeting other people.

In December 2009, the claimant was diagnosed with a major depressive disorder, moderate, asymptomatic HIV, and he was accorded a GAF of 57, representing only moderate symptoms.

By letter dated December 2009, Dr. Lim and Ms. Cunha Attrino reported diagnoses of a major depressive disorder, recurrent, moderate, and PTSD, which required frequent follow-up and treatment. The narrative report stated that the claimant's symptoms included: a depressed mood, crying spells, anhedonia, irritability, poor sleep and appetite, poor memory and concentration, suicidal thinking, anxiety and panic attacks as well as feelings of helplessness, nightmares, flashbacks, a loss of memory, numbing and angry outbursts. According to that report, the claimant was unable to perform his activities of daily living at times, he was isolated from people, was fearful to leave his apartment, and did not want to attend support groups. At that time, the claimant was taking Cymbalta, Trazodone, and Lorazepam. The report stated that the claimant had been unable to sustain any gainful employment for the last several years.

. . . . Subsequent UBH treatment records from February to July 2010 indicated that in February 2010, the claimant reported a lot of anxiety and worry and difficulty sleeping, and his mood was sad, depressed and anxious. Nonetheless, even when isolating, the claimant's concentration in February 2010 was good; he was doing well, his mood was stable and he had no side effects and was noted to be much improved. By June 2010, the claimant had only occasional ongoing anxiety and no suicidal ideation; and in July 2010 he was reportedly doing well and had no acute symptoms or side effects from medications, and his HIV also was stable. The claimant's cognitive behavioral therapy ("CBT") was terminated in October 2010; he had a euthymic mood and was noted to have made significant improvement.

In fact, elsewhere, the records from UBH indicated that in January 2010, the claimant was "thinking of whether he should look for work or appeal this decision" and that he would appeal because it would affect his current benefits were he to work; he also did not know if he was capable of working. In February 2010, the claimant stated that he was anxious and was isolating. By July 2010, however, the claimant - he was taking Cymbalta, Lorazepam and Trazodone - was doing well and had no acute symptoms or side effects and in November 2010 he was [still] doing fairly well, and had no side effects and was stable.

Moreover, the treatment note from April 2011 documented an essentially normal mental status examination despite the claimant's complaints of feeling more depressed recently and poor sleep with racing thoughts. On examination, the claimant's judgment, insight and abstract thinking were good and his concentration, attention and memory were intact - no clinical signs were reported - and he was accorded a GAF of 60.

Records from August 2011 indicated that the claimant was feeling greater stress and worry; he would be breaking up with his boyfriend and was nearing the September 11th anniversary. On examination, the claimant's mood and affect were tense and anxious

and in November 2011, he was meeting with random men from the internet. Notwithstanding, the claimant's mental status examinations were in large part normal except for a low mood with a constricted affect, but his attention and concentration were still good.

Despite the relatively mild clinical signs contemporaneously documented during the mental status examinations, the claimant's treating sources reported that the claimant was markedly limited and was unable to work. I have considered each of them.

In March 2010, for example, Dr. Lim and Ms. Attrino reported diagnoses of major depression and PTSD, and a GAF of 57. In checklist fashion, they noted various clinical signs, namely: poor memory, a sleep disturbance, recurrent panic attacks, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal, intrusive recollections of traumatic experiences and persistent irrational fears. The claimant was markedly limited in his ability to understand and remember detailed instructions; in maintaining his attention and concentration for extended periods; in performing activities within a schedule and maintaining regular attendance and punctuality; and in working in coordination with or proximity to others without being distracted by them; in completing a normal workweek; in asking simple questions or accepting instructions and responding appropriately to criticism from supervisors; in responding appropriately to changes in the work setting; and in being aware of normal hazards and taking appropriate precautions. The form also indicated that the claimant was moderately limited in his ability to travel to unfamiliar places, set realistic goals, maintain socially appropriate behavior and get along with others and the public and would need to be absent more than three times monthly. The claimant was capable of managing low stress.

In October 2010, Dr. Lim reported little variation and reported marked limitations and that the claimant would be absent about two to three times per month.

In June 2011, Diana Riccioli, M.D., an examining psychiatrist, reported a GAF of 50 and numerous clinical signs, including sleep and mood disturbance, emotional lability, recurrent panic attacks, psychomotor agitation, difficulty thinking, suicidal ideation, social withdrawal, a blunt, flat or inappropriate affect, decreased energy, intrusive recollections and generalized persistent anxiety. Dr. Riccioli, however, reported marked limitations for sustaining an ordinary routine without supervision, working in coordination with or proximity to others without being distracted by them; and completing a normal workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods. Dr. Riccioli stated that the claimant was otherwise moderately limited and incapable of even low stress and would be absent more than three times monthly.

In August 2011, Dr. Pesci, M.D., also a treating psychiatrist, stated in a report that was co-signed by Elizabeth Cunha-Attrino, likewise reported numerous marked limitations

in the claimant's ability to concentrate and persist; interact with others; and in his adaptability and stated that he would be absent from work more than three times monthly and was incapable of even low stress. Dr. Pesci also reported that the claimant had difficulty thinking, had suicidal ideation, feelings of guilt or worthlessness, psychomotor agitation, mood and sleep disturbances, generalized anxiety and social withdrawal.

In August 2011, Ms. Cunha-Attrino reported that the claimant was still attending weekly individual therapy sessions. Ms. Attrino reported numerous clinical signs and stated that the claimant was at times unable to do his activities of daily living, was isolated and had inconsistent sleep patterns and had nightmares. The claimant was still taking Cymbalta and Trazodone. Ms. Attrino stated that the claimant had been unable to sustain any gainful employment for the past several years.

Also in August 2011, Dr. Pesci reported that the claimant's mood was low and that he had a tendency to isolate and that his sleep and appetite were stable but that as the September 11th anniversary approached, he incurred more intense symptoms.

Yet another treating psychiatrist since March 2005 - Dr. Chakrabarti, M.D. at Rutgers University Behavioral Healthcare, reported in March 2014, that the claimant had marked limitations. Dr. Chakrabarti reported: a poor memory, sleep and mood disturbance, social withdrawal or isolation, decreased energy, intrusive recollections, persistent irrational fears, generalized persistent anxiety, hostility and irritability, difficulty thinking or concentrating, feelings of guilt/ worthlessness, and anhedonia. Dr. Chakrabarti also stated that the claimant had a depressed mood and affect, paranoid thoughts and nightmares and was socially isolated. Dr. Chakrabarti reported that the claimant had marked limitations in completing a normal workweek, accepting instructions and responding appropriately to criticism from supervisors, and getting along with others, setting realistic goals and being aware of normal hazards and taking appropriate precautions and that these limitations dated back to March 2005.

In an undated report, Dr. Riccioli, M.D., a non-treating but examining psychiatrist, reported that after the September 11th attacks, the claimant's work was interrupted due to decreased concentration, depression and anxiety and that he had had flashbacks and nightmares, abused drugs and in 2005 became homeless and entered rehabilitation and lived in a shelter for 18 months. On examination, the claimant had rapid and pressured but lucid speech and a depressed and anxious mood, but no other signs were reported. Dr. Riccioli diagnosed depression, a general anxiety disorder with panic, PTSD and accorded the claimant a GAF of 50 and stated that the claimant was unable to work any job. I give Dr. Riccioli's opinion little weight because the issue of disability is reserved to the Commissioner.

As part of this application process, the claimant also underwent two consultative psychiatric examinations, the first of which was performed in December 2007 by Dr. Kim Arrington, Psy.D. At that time, the claimant was taking Trazodone, Cymbalta,

Epzicom, Kaletra and Albuterol.  The claimant stated that he had difficulty falling asleep, a loss of appetite with a weight loss of 20 pounds, fatigue, social withdrawal and anxiety related symptoms, including excessive worry, irritability, difficulty concentrating and hypervigilance, flashbacks and a fearfulness of crowds, panic attacks with heart palpitations, sweating and chest pain.  On examination, the claimant's motor behavior was somewhat lethargic; his affect was dysphoric and his mood dysthymic; however, the claimant's memory was only mildly impaired and his examination was otherwise normal.  Dr. Arrington diagnosed post traumatic stress disorder and opined that the claimant could follow, understand and carry out simple instructions independently; maintain his attention and concentration for brief periods and a regular schedule.  Dr. Arrington also stated that the claimant may struggle somewhat with learning new tasks and performing complex tasks independently and needed support to make appropriate decisions, relate adequately with others, and appropriately deal with stress and that his psychiatric problem may significantly interfere with his ability to function on a daily basis.

The second consultative psychiatric examination was performed in June 2011 by Dr. Iofin, M.D.  On examination, the claimant had reasonable eye contact and his examination revealed no outwardly apparent positive clinical signs.  Dr. Iofin diagnosed PTSD, a depressive and anxiety disorder and substance abuse and accorded the claimant a GAF of 62, representing only some mild symptoms.

After having reviewed all of the evidence, I find that prior to January 23, 2012, the claimant was capable of doing unskilled work on a sustained basis subject to the limitations described above.  In doing so, I have considered all of the opinions in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.  Although the claimant's treating sources -Drs. Lim, Pesci, and Chakrabarti and Ms. Attrino -have reported that the claimant has marked limitations and unanimously concluded that the claimant has been unable to work, I do not give their opinions significant weight because they are not supported by the mental status examinations in the contemporaneous clinic notes.  In fact, in many instances, the opinions are undermined by the claimant's near normal mental status examinations and relatively high GAF ratings, the latter of which is a tool used by mental health professionals to gauge an individual's overall functioning level.  I will discuss each of the opinions below.

First, however, I note that the earlier contemporaneous treatment records from 2007 to 2010 indicated that the claimant was doing well overall and that his mental status examinations were normal with the occasional depressed or anxious mood and are therefore inconsistent with a finding of marked limitations.  Specifically, the claimant's mental status examinations were far more often than not, normal.  This is apparent by the examinations documented in November 2006 and in January, March and May 2007, in March, June, September and October 2008 and in March 2009, and April and September 2009, and in February and July 2010, and in November 2010.  In fact, in

October 2010, the claimant's mood was euthymic, and he had just completed 12 sessions of his PTSD study with significant improvement. I also note that in November 2011, the claimant's examination was normal except for a dysphoric mood.

Additionally, the treatment notes also documented reports that the claimant was doing well overall - in August, September and November 2006, January, March, April and November 2007, and in July 2008; and in June, August, September and October 2008 and in January and March 2009, and in September 2009 and July 2010, and was still doing fairly well in November 2010.

Moreover, Dr. Stoler's reports also indicated that the claimant had consistently denied depression and anxiety as apparent by his reports in April, May, October and December 2007, and in May, June and August 2007, and in April, October and November 2008 and in January, April, August and September 2009.

Second, the claimant's GAF scores reflected no greater than moderate functional limitations. Although already referenced above, I note that the claimant's GAF rating was 65 at the outset of treatment in March 2005; that it was 57 in December 2009, and in March 2010; and 60 in April 2011.

In light of the above, it is difficult to reconcile the marked limitations reported by Drs. Lim and Pesci and Ms. Cunha-Attrino . . . with the treatment records. Dr. Lim rarely reported any positive clinical signs during his mental status examinations and none that would warrant his opinion that the claimant had marked limitations. More often than not, the treatment records reported that the claimant's mood and mental status were stable and that he was doing well. Moreover, his treating sources at UBH reported throughout 2008 and 2009 that the claimant was by and large doing well - his normal mental status examinations suggested as much - and that he was staying active, feeling okay, socializing and had no side effects from the medications. In fact, many of these notes were written by Dr. Lim himself. In light of the discrepancies between the assessments of Dr. Lim and the treatment notes -many of them his - I do not accord his opinion significant weight. Dr. Lim, for example, stated that the claimant had difficulty thinking and concentrating and was socially withdrawn and had a poor memory; however, the claimant's concentration and attention and memory were noted to be good and intact on examinations. Further, the treatment records indicated that in 2008 the claimant was dating, had traveled to D.C. for an AIDS walk and had attended a weekend retreat in June 2008 and was socializing and keeping busy with activities and looking forward to the holidays in December 2008. In April 2008, the claimant also stated that he was motivated for work if he was denied SSI. Moreover, in August 2009, the claimant reported that he was extending his social network and meeting new people and in December 2009 had identified returning to work as a goal. [The claimant testified, however, that returning to work had never been a treatment goal.] As such, the examinations and the claimant's activities are inconsistent with an inability to satisfy the demands of unskilled work.

For like reasons, I accord Dr. Pesci's opinion at Exhibit 35F little weight. Dr. Pesci reported in August 2011 that the claimant had difficulty thinking, had suicidal ideation, feelings of guilt or worthlessness, psychomotor agitation, mood and sleep disturbances, generalized anxiety and social withdrawal. As already discussed, however, the claimant's concentration was more often than not good on examination and he consistently denied suicidal ideation. I also note that in a report signed by Dr. Pesci in April 2011 -just months before -the claimant's mental status examination was normal except for a sad mood and constricted affect, and his GAF was 60 and he was independent in performing his household chores.

Moreover, given the claimant's GAF of 59, I accord Dr. Chakrabarti's opinion little weight. I also note that Dr. Chakrabarti indicated that these limitations dated back to March 2005; however, as already discussed above, the earlier treatment notes in particular documented near normal mental status examinations and that the claimant was doing well. Of equal significance is the fact that Dr. Chakrabarti had only seen the claimant for four to six weeks (Testimony), which renders his opinion of very limited value.

In contrast to the treating source opinions, in 2007, Dr. Arrington opined that the claimant could follow, understand and carry out simple instructions independently; maintain his attention and concentration for brief periods and maintain a regular schedule and that the claimant may struggle somewhat with learning new tasks and performing complex tasks independently and needed support to make appropriate decisions, relate adequately with others, and appropriately deal with stress and that his psychiatric problem may significantly interfere with his ability to function on a daily basis. Because it is consistent with the treatment records already discussed, I accord Dr. Arrington's opinion significant weight.

Similarly, in June 2011, Dr. Iofin reported a normal examination and a GAF of 62, which also is consistent with the examinations and with Dr. Pesci's April 2011 report ....

I also note that there are inconsistencies between the claimant's allegations and the treatment records, which undermine his credibility (20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p). Although the claimant experienced traumatic events that have without doubt significantly affected and limited him -there is no question in that - the record fails to show that once he stopped abusing drugs and started treatment for his depression and PTSD, he was not altogether foreclosed from working until January 2012. In August 2006, for example, a treatment note indicated that the claimant was doing well, had finished school and was looking for a job, and in January 2008, the treatment records from UBH indicated that one of the claimant's goals was to obtain work, and in April 2008 and in December 2009 he again identified returning to work as a goal. In direct contrast, however, the claimant testified that the goal of therapy had never been to work but to manage stress. Moreover, despite testimony to the contrary at the beginning of the hearing, the claimant subsequently testified that he had participated

in a certificate program as a medical assistant, but had never availed himself to job placement that was offered through the program. The claimant also had expressed concern that working would affect his benefits.

I also note that in April 2011, the claimant stated that he took Ativan only infrequently for panic attacks and that he was independent in his grooming, his household chores and in getting around. In fact, Dr. Pesci, his treating psychiatrist at the time, accorded the claimant a GAF of 60, which is on the high end of moderate symptoms. As already noted above, the claimant was socially active, dating and keeping busy.

I also note that the claimant's testimony belies any consequence of his fatigue. The claimant testified, for example, that he woke up at 9 a.m., made coffee and watched television. Moreover, at the end of 2006, the claimant had participated in an outpatient program at Passaic Beth Israel that he attended five days per week from 10 a.m. to 3 p.m. The claimant had perfect attendance because, he testified, he would be terminated from the program and he did not want to become homeless. Nonetheless, the claimant's attendance showed an ability to maintain a schedule at that time.

In sum, a finding that the claimant could do jobs that involve simple, routine and repetitive tasks in a job that requires only occasional contact with co-workers, supervisors and the general public is supported by the record and would accommodate the claimant's psychiatric limitations that were present prior to January 23, 2012.

As of January 23, 2012, however, the record documents more frequent and significant positive clinical signs and a general deterioration in the claimant's condition, which supports a finding that the claimant was as of January 23, 2012 unable to satisfy the basic mental demands of competitive work as described at SSR 85-15.

Specifically, the treatment records from January 23, 2012 indicated that claimant felt very down and anxious about the future, that his sleep was disrupted and that he was not getting much benefit from his sleep medication. Additionally, the claimant was much more anxious and depressed. Moreover, by March 12, 2012, the claimant reported "a lot of nightmares recently" of deceased loved ones and that he was sleeping a lot more and having great difficulty getting out of bed in the mornings despite his use of Trazodone. The claimant also reported nightmares, isolation, and his examinations revealed a fairly consistent dysphoric mood and affect and difficulty sleeping. The GAF rating of 59 in April 2012, did not accurately reflect the claimant's mental status as presented during the examination. Moreover, in April 2012, the claimant again stated that his sleep was disrupted with nightmares at least several times per week. This no doubt would affect the claimant's ability to concentrate on even simple tasks during the day.

Moreover, for the first time that I could see in my review of this record, the claimant reported ongoing fatigue and peripheral neuropathy as well as nightmares and feelings of emptiness, sadness and loneliness; the claimant was discharged from Cymbalta and started on Lexapro. In April 2012, the claimant was presenting as depressed and he

stated that he was isolating and avoiding social contacts much more. In June 2012, the claimant continued to report feeling very depressed, isolated, and anxious. In July 2012, the claimant reported better energy and his mental status examination indicated good concentration; however, he still had a sad mood and constricted affect, increased depression and insomnia and reported that he woke up four to five times per week and continued to have nightmares.

Nor was improvement forthcoming.

To the contrary, in September 2012, the claimant reported continued feelings of sadness and depression, feelings of hopelessness and the absence of friends and family in his life, and in October, 2012 he continued to report a low mood, anxiety, panic attacks, nightmares and avoidance behavior. In fact, the Treatment Plan updated indicated that the claimant suffered from a serious and persistent mental illness that would require ongoing treatment to control symptoms. In November 2012, he was started on Clonidine in addition to Lexapro, Trazodone and Ativan, which by December 2012, had not made much of an impression. On examination, the claimant's speech was underproductive, he reported illusions and isolative behavior; and exhibited a sad mood and restricted affect and continued insomnia. By February 2013, the claimant reported paranoia, mood swings and intrusive and obsessive thinking of September 11th as well as anxiety when around others, a lack of motivation and persistent isolation despite his compliance with medications. The claimant continued to make these complaints into May 2013 and he had suffered increasing flashbacks and PTSD symptoms due to the terrorist bombings in Boston. The claimant was then taking Effexor and Abilify. The claimant's condition was again exacerbated in May 2013 when his nephew was killed in a motor accident; he reported having no motivation to do anything and felt like staying in bed all day; his concentration was poor and Lexapro had [still] made no impact on his depression (Exhibit 52F at 20). In June 2013, the claimant reported a somewhat stable mood and fewer flashbacks and some nightmares and improvement in his depression and anxiety but in August 2013, he reported having had a panic attack on the bus. By September 2013, the claimant remained depressed and complained of fatigue, a sad mood, feelings of hopelessness and helplessness and a lack of motivation and in November 2013, he reported preoccupations about past traumas and a depressed and constricted mood and affect.

These treatment records differ dramatically from the earlier records. The claimant had previously had an euthymic mood, appropriate affect and stable mood; and he had been extending his social network, not withdrawing from it. Further, in 2010, the claimant was doing well, his mood was still stable and he had reported only occasional anxiety.

Most recently, the claimant was examined by Lidia Abrams, Ph.D., also consultative in nature, in April 2014. The claimant stated that prior to September 11th he had been far more outgoing and attended happy hours, movies, dinners and the gym. The claimant stated that he had almost no social interactions other than at his meetings.

16

Notwithstanding, the claimant's examination revealed no positive clinical signs; the claimant's speech was normal; he had no delusions or hallucinations and had no suicidal or self-destructive intent or plans. Dr. Abrams diagnosed PTSD, a major depressive disorder, severe, and a panic disorder with agoraphobia and accorded the claimant a GAF of 50. . . . Dr. Abrams concluded that the claimant was not malingering and was permanently impaired and unable to be gainfully employed. By separate assessment, Dr. Abrams reported marked limitations and opined, essentially, that the claimant was unable to work. I find that Dr. Abrams' report also is supported by the treatment records from 2012 to 2014.

. . . . Based on the treatment records as of January 23, 2012, the claimant's mental status deteriorated and he was no longer able to concentrate for extended periods of time; and he was unable to interact appropriately with others. Moreover, that the claimant was having difficulty getting out of bed and as such, would be unable to meet the attendance and punctuality requirements of any job.

Although I did not accord the opinions of the claimant's treating sources much weight prior to January 2012 because they were inconsistent with the findings reported during the examinations, I do accord the August 2013 assessment by Ms. Attrino and Dr. Francisco considerable weight. This is because by that time, the contemporaneous treatment records documented significant and persistent clinical signs and symptoms from January 2012 forward.

Specifically, in August 2013, Ms. Attrino and Dr. Francisco, M.D, reported that the claimant continued to have chronic anxiety symptoms, poor sleep, nightmares, flashbacks, isolation and a fear of venturing outside, panic attacks and that he was markedly limited in virtually all areas of functioning, apparently despite medications - Effexor, Ativan, Trazodone and Abilify - and was incapable of doing even low stress work and would be out more than three times a month.

As such, a finding that the claimant was unable to sustain the mental demands of work since January 23, 2012, is sufficiently supported by the treatment records.

. . . . In sum, the claimant was capable of work subject to the mental, postural and environmental restrictions noted above prior to January 23, 2012.

The claimant has been unable to perform his past relevant work since his alleged onset date (20 CFR 404.1565 and 416.965).

The claimant worked as a paralegal, which, by his account, required him to sit all day and lift less than 10 pounds. The claimant's job duties required him to manage the calendar for 100 attorneys, call courts, schedule depositions, file court documents, type reports and supervise two people.

The vocational expert testified that Section 202.362-010 of the Dictionary of Occupational Titles classified the work of a managing paralegal clerk as skilled and

17

involving sedentary exertion.

Because the claimant was restricted to the performance of unskilled work prior to January 23, 2012 and could not do even unskilled work as of January 23, 2012, he has been unable to resume his past relevant work as a paralegal at all times since March 20, 2005.

The claimant was born on January 6, 1959 and was a younger individual until January 6, 2009, his 50th birthday, on which date he became an individual closely approaching advanced age. On January 6, 2014, the claimant's 55th birthday, the claimant became an individual of advanced age (20 CFR 404.1563 and 416.963).

The claimant has a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

The claimant has transferable job skills (20 CFR 404.1568 and 416.968).

Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

. . . . If the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by Medical-Vocational Rules 203.29 and 203.22. However, the claimant's ability to perform all or substantially all of the requirements of this level of work was impeded by additional limitations. To determine the extent to which his limitation eroded the occupational base for unskilled work prior to January 23, 2012, I asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity as described above. The vocational expert testified that given all of these factors the individual would have been able to perform the requirements of light and unskilled representative occupations such as: a mail clerk (Section 209.687-026), of which there were 99,140 such jobs in the national economy; a remnants cutter (Section 789.687-150), of which there were 13,740 such jobs in the national economy; and an office helper (Section 239.567-010), of which there were 66,840 such jobs in the national economy.

Pursuant to SSR 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, I conclude that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that exists in significant numbers in the national economy prior to January 23, 2012. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rules prior to January 23, 2012.

Considering the claimant's age, education, work experience, and residual functional

capacity as of January 23, 2012, there are no jobs that exist in significant numbers in the national economy that the claimant has been able to perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

This is because the claimant has been since January 23, 2012, unable to satisfy the basic mental demands of work as described at SSR 85-15.  In sum, the record shows that the claimant has incurred a substantial loss of ability to perform even simple instructions on a sustained basis, respond appropriately to supervision, coworkers and the usual work situation and deal with changes in the workplace secondary to his PTSD and depressive symptoms . . . .  Moreover, the records indicated that the claimant was having difficulty getting out of bed and as such, would have even greater difficulty attending to a full-time work schedule on a regular and continuing basis (SSR 96-8p).

(R. at 21–43.)  The ALJ thus found that Folger had been mentally disabled within the meaning of the Social Security Act as of January 23, 2012, but not before that date.  (R. at 43.)

Folger requested a review of the Decision of the ALJ by the Appeals Council.  On February 3, 2016, the Appeals Council denied Folger's request.  (R. at 1–3.)  This appeal by Folger ensued.

## ARGUMENTS AND DISCUSSION

The Court must affirm the Decision if the ALJ's findings of fact are supported by substantial evidence, i.e., evidence that a reasonable mind might accept as adequate to support a conclusion.  See 42 U.S.C. § 405(g); Reefer v. Barnhart, 326 F.3d 376, 379 (3d Cir. 2003); Schaudeck v. Commissioner of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999).  The Court must be deferential to the inferences drawn by the ALJ from the facts if those inferences, in turn, are supported by substantial evidence.  See Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); see also Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (stating that a court "will not set the Commissioner's decision aside if it is supported by substantial evidence, even if we would have decided the factual inquiry differently").

## I.     Alleged Impairments other than Mental Impairment

In the Decision, the ALJ addressed other pre-2012 impairments that were alleged by Folger.  In addition, Folger mentions those other alleged impairments in his complaint and in his primary

statement of contentions filed pursuant to Local Civil Rule 9.1.

However, Folger only raises arguments concerning his alleged mental impairment on this appeal. (See dkt. 9 at 28–40; see also dkt. 9 at 7 n.8 (Folger stating that "Only the evidence related to Mr. Folger's mental impairments is summarized here as Plaintiff does not dispute the physical limitations found by the ALJ").) Thus, Folger has abandoned any claim for benefits based on any pre-2012 impairments other than those based on a mental disability. See Knepp v. Apfel, 204 F.3d 78, 84 (3d Cir. 2000) (noting that only the portion of the ALJ's decision that was challenged by the plaintiff in federal court was subject to review); Gill v. Colvin, No. 13-2112, 2014 WL 4411048, at *7 n.2 (M.D. Pa. Sept. 8, 2014) (noting that the plaintiff asserted in the complaint that the ALJ failed to properly evaluate her complaints of pain, but that this argument was waived due to the plaintiff's failure to discuss it in the brief); Kriebel v. Astrue, No. 10-152, 2012 WL 1032467, at *3 (W.D. Pa. Mar. 27, 2012) (noting that the plaintiff asserted only that the ALJ erred as to the evaluation of her mental impairment, and thus the plaintiff waived any argument that she was disabled due to any physical impairment).

## II.    Mental Impairment

Folger argues that the ALJ incorrectly found that the contemporaneous notes detailing his psychiatric treatment showed that he possessed near normal mental status examinations, and thus Folger argues that the ALJ failed to give proper weight to the opinions from his treating mental health specialists that he was unable to work.   (See, e.g., dkt. 9 at 29 (Folger arguing that the "ALJ grossly mischaracterized the record by concluding that the opinions from Mr. Folger's treating psychiatrists conflict with 'near normal' mental status findings during the period at issue").)

Folger's argument here is without merit.  Indeed, several contemporaneous treatment records relied upon by Folger to refute the ALJ's conclusion that Folger was not mentally disabled before January 2012 actually support the ALJ's conclusion.  (See, e.g., R. at 936 (2007 note from Dr. Lim

stating Folger was "psychiatrically stable"); R. at 1458 (2009 note from Dr. Lim stating the same); R. at 2451–2456 (2011 mental evaluation by Dr. Riccioli assessing the majority of Folger's mental activities as being not limited, mildly limited, or moderately limited, as opposed to those activities being markedly limited).)

Furthermore, the Court's review of the contemporaneous records from Folger's treating professionals that were cited by the ALJ in the Decision reveals that those records support the conclusion that Folger was psychiatrically stable and was not mentally disabled before January 2012. (See, e.g., R at 943 (November 2006 note stating Folger was psychiatrically stable); R. at 941 (January 2007 note stating Folger was psychiatrically stable and "much improved"); R. at 939 (May 2007 note stating the same); R. at 1388 (October 2008 note stating Folger was psychiatrically stable and "very much improved"); R. at 1381 (March 2009 note stating the same); R. at 1817 (February 2010 note stating Folger was psychiatrically stable, much improved, and had a euthymic mood[1]); R at 2199 (November 2010 note stating Folger was psychiatrically stable and much improved).)  Thus, the ALJ's conclusion that Folger was not mentally disabled before January 2012 was supported by substantial evidence.  See Grogan v. Commissioner of Soc. Sec., 459 Fed.Appx. 132, 139 (3d Cir. 2012) (finding that the opinion of the plaintiff's treating psychiatrist that the plaintiff was disabled was inconsistent with the psychiatrist's own treatment records, which set forth that the plaintiff had mild to moderate symptoms, appropriate grooming, and an improving condition); Wright v. Commissioner of Soc. Sec., 386 Fed.Appx. 105, 108 (3d Cir. 2010) (finding that the opinion of the plaintiff's treating psychiatrist that the plaintiff was disabled was inconsistent with the psychiatrist's own treatment records, which indicated that the plaintiff had slight to marked limitations and

---

[1]      Euthymic is defined as pertaining to a normal mood in which the range of emotions is neither depressed nor highly elevated. See Schrader v. Astrue, No. 11-902, 2012 WL 4504625 at *6 n.16 (M.D. Pa. Sept. 28, 2012).

intended to return to work).

With respect the ALJ's determination to discount the opinions that Folger was unable to work, the ALJ was not required to give such opinions significant weight. "The ALJ — not treating or examining physicians or State agency consultants — must make the ultimate disability and RFC determinations." Chandler v. Commissioner of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c)). The ALJ was required to consider those opinions — which the ALJ did in a comprehensive manner — but those opinions did not bind the ALJ due to the contradictory evidence found in the record. See Chandler, 667 F.3d at 361; Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (stating that an ALJ may reject a medical opinion outright based upon contradictory medical evidence).

Giving the ALJ the required due deference, the Court finds that there was substantial evidence to support the ALJ's assessment of the treatment records, Folger's testimony, and all of Folger's evaluations, as well as the ALJ's conclusion that Folger was not disabled due to a mental impairment before January 2012. The ALJ showed that he considered the opinions of the treating professionals and the consultative professionals, and explained why he gave significant weight to the latter over the former. See Kerdman v. Commissioner of Soc. Sec., 607 Fed.Appx. 141, 143 (3d Cir. 2015) (finding that the substantial evidence supported the ALJ's findings concerning the claimant's lack of mental impairment).

### III.   Folger's Credibility

Folger argues that the ALJ erred in finding his testimony concerning his alleged mental disability before 2012 to be not credible.

This argument is also without merit. The ALJ had the discretion to evaluate Folger's credibility and to render an independent judgment in light of the psychiatric findings, the medical records, and the other evidence regarding the true extent of Folger's alleged symptoms before

January 2012.  See Malloy v. Commissioner of Soc. Sec., 306 Fed.Appx. 761, 765 (3d Cir. 2009)

(citing Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)); see also Hoyman v. Colvin, 606

Fed.Appx. 678, 681 (3d Cir. 2015) (stating that an ALJ's credibility assessment is virtually

unreviewable on an appeal).  The Court finds that the ALJ performed this evaluation in this case in a

comprehensive manner in the Decision.  The ALJ addressed Folger's subjective complaints in the

Decision, and then set forth why he discounted them based on the contemporaneous records of his

treatment before January 2012.  (See R. at 34–35.)

## CONCLUSION

For the foregoing reasons, the Court affirms the Decision of the ALJ.  The Court will issue an

appropriate Order.


_____

JOSE L. LINARES

United States District Judge


**Dated:**  January  ____30____ , 2017